Harris W. Watkins v. Commissioner.
Harris W. Watkins v. Commissioner
Docket No. 10115.
United States Tax Court
1947 Tax Ct. Memo LEXIS 184; 6 T.C.M. (CCH) 652; T.C.M. (RIA) 47157; June 16, 1947
*184 Leonard B. Frutkin, Esq., 116 John St., New York 7, N. Y., for the petitioner. William B. Springer, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $2,775.78 in the income tax of the petitioner for the calendar year 1943. The only issue for decision is whether $8,000 received by the petitioner from Trinity Operating Company, Inc. was free from income tax because it was a gift. Findings of Fact The petitioner filed his individual income tax returns for 1942 and 1943 with the collector of internal revenue for the second district of New York. Trinity Church, in New York City, was granted a large tract of land many years ago by Queen Anne. The church itself occupies only a portion of the land and the remainder is rented. Trinity Operating Company, Inc. (hereafter referred to as Operating) was organized about 1938 for the purpose of managing the business real estate owned by the church. It is a wholly owned subsidiary of a religious corporation and is exempt from federal income tax under section 101 (6). The sole stockholder is known as "the rector, church wardens, and vestrymen of Trinity Church. *185 " The ten directors, with the exception of the president, are and were members of the vestry of the Trinity Church. There are 21 vestrymen. The petitioner was the treasurer and the highest paid officer of Operating from the time of its organization up to the first of November, 1942. Prior to that time he had managed the properties of the church as an agent. He was elected to serve subject to the pleasure of the board of directors. His salary for 1942 was on the basis of $16,000 for 12 months. The rector informed the board of directors, in the fall of 1942, that he was receiving complaints from some of the important tenants who rented property that the petitioner was arbitrary and difficult to get along with. The rector felt that this situation should not be allowed to continue. The board realized, however, that the petitioner had done excellent work in the past on behalf of Operating. Alden D. Stanton, a real estate broker, had been president of Operating for many years until he voluntarily resigned on November 30, 1942. The following resolution was unanimously carried at a special meeting of the board of directors of Operating held on October 14, 1942: "RESOLVED that the president *186 be asked to terminate the employment of Mr. Harris W. Watkins as Treasurer by resignation or otherwise forthwith, and that the question of severance pay be left to the President and Mr. Hasler for determination with power." The minutes of a meeting of the board of directors held on October 28, 1942 show approval of the minutes of the meeting of October 14th and are in part as follows: "The President then stated that he would like to give the Directors his reaction to the request made at the meeting of October 14th. He stated that the action was taken without his previous knowledge, and had been a complete surprise to him; that he had since acted under advice of Counsel in the matter. "He stated first, that such precipitate action would disorganize and disrupt the activities now being carried on; second, that it would be impossible for the two other executives to properly handle the affairs of the company; third, that he considered it unwise and unfair to the Treasurer to peremptorily dismiss him without stating a reasonable cause after four years and eight months of what he termed remarkable service to the company; fourth, that without an opportunity to substitute and train new *187 employees, serious financial losses would be sustained. "In support thereof, the President offered evidence to show that the Treasurer was held in high esteem by tenants and that our labor relations were said by the Union to be the finest in this City. He stated further that, while the Treasurer had made plans for re-entry into the Service, he felt that the effect of this action would be such as to prevent his passing the necessary physical tests at this time. "He stated further that the Treasurer had no desire to remain in the employ of this company indefinitely and that, as President, he could bring about the change desired on a mutually agreeable basis if given a reasonable to work it out. "The President then recommended that the record of action taken at the meeting of October 14th be expunged, and that the matter be taken up on the basis of sufficient time being given to reorganize the staff, in order to avoid undue embarrassment either to the Company or to the Treasurer. "The question as to the time required was asked and the President stated that, while the uncompleted transactions might take until April, it was quite possible that the Treasurer would have rejoined the *188 Service prior to that time. "The matter was discussed at length and resentment was expressed as to the 'presumptuous' suggestion that the action of the Board, taken after long deliberation, should be changed. "Mr. Hasler stated that he had discussed with the President the question of severance pay, but that he had suggested no basis, and the President stated that if the Treasurer had committed any act warranting immediate dismissal, no question of severance pay would be involved. "The President was directed to proceed with the carrying out of the resolution adopted at the meeting of October 14, 1942 to terminate the employment of the Treasurer. The Treasurer was to be given an opportunity to resign if he desired to do so." The following is an exempt from the minutes of the meeting of the board of directors held on October 30, 1942: The President stated that he had advised the Treasurer of the suggestion of the Board, made at its meeting of October 28th, and had outlined to him the proposal that he resign as of October 31st, and further that his salary would continue for six months beginning November 1st. "The President then stated that the Treasurer had refused to resign *189 as of October 31st, 1942. "The President asked if the suggestion to pay salary for six months period was contingent upon the Treasurer's resigning and stated that he would like to have instructions as to what, if anything, should be paid after the Treasurer's dismissal on October 31st. "After a discussion, and "Upon motion duly made, seconded and unanimously carried, it was "RESOLVED that the President be authorized to pay to Mr. Harris W. Watkins, monthly, an amount equal to his salary for a period of six months beginning November 1, 1942 in appreciation of his past services; provided that, with the discontinuance of his services the Trinity Operating Company, Inc. is released from all rights and claims to pension and retirement benefits not already accrued up to October 31st, 1942." (See correction minutes of meeting of Dec. 28, 1942.) The board of directors at a meeting held on November 23, 1942 expunged the following from the minutes of the meeting of October 28th: "It was the consensus of opinion that no further action should be taken but that the Treasurer's resignation should be effective as of October 31, 1942; that his duties should cease as of that date, and further *190 that an offer be made to pay his salary for six months beginning November 1st." and substituted the following: "The President was directed to proceed with the carrying out of the resolution adopted at the meeting of October 14, 1942 to terminate the employment of the Treasurer. The Treasurer was to be given an opportunity to resign if he desired to do so." It was also resolved at that same meeting that the minutes of the meeting of October 30th be changed so as to substitute the word "suggestion" for the word "offer" in the sentence, "The President then asked if the offer to pay salary for six months period was contingent upon the Treasurer's resigning * * *" The following is an excerpt from the minutes of the meeting of the board of directors held on December 28, 1942: "Reference was made to letters written by Mr. Stickney under dates of November 30th and December 8th, 1942, requesting correction of the minutes of the meeting of October 30th, 1942. "Upon motion made, seconded and unanimously carried, it was "RESOLVED that the resolution in the minutes of the meeting of Trinity Operating Company, Inc. of October 30th, 1942, relating to payment to Mr. Harris W. Watkins *191 in appreciation of his past services be amended to read as follows: "RESOLVED that the President be authorized to pay to Mr. Harris W. Watkins the sum of $8,000 in equal monthly installments of $1,333.33 each for a period of six months beginning November 1, 1942, in appreciation of his past services; provided that with the discontinuance of his services, Trinity Operating Company, Inc. is released from all rights and claims to pension and retirement benefits not already accrued up to October 31, 1942." The petitioner was dismissed as treasurer of Operating at the close of business on October 31, 1942. He immediately signed an agreement releasing Operating from all rights and claims for pension and retirement benefits not already accrued up to October 31, 1942 and withdrew the contributions which he had made up to that time to the retirement plan. Operating paid the petitioner $1,333.33 in November and in December 1942 and in each of the first 4 months of 1943. The first payment was charged through the payroll records of Operating. The payment for December was charged to profit and loss. The payments made in 1943 were designated "Gratuities" on a journal voucher of Operating under *192 date of April 30, 1943, "to charge expense with balance in the above accounts as of April 30, 1943." The board desired to terminate the authority of the petitioner at the end of October 1942. A release of his rights under the pension and retirement fund was required because the board felt that the payment of a salary after October 31, 1942 would give the petitioner some claim to benefits under the pension plan during that period, deductions from his salary would be required under the plan and, if anything happened to him, some of his heirs might make a claim under the pension plan. The Commissioner, in determining the deficiency, added $2,666.66 to the petitioner's income for 1942 and $5,333.34 to his income for 1943 with the explanation that the $8,000 voted him by the Board of Directors of Operating was in consideration of past services rendered by him to that corporation and, as such, constitutes taxable income rather than a gift exempt from tax. The payments of $8,000 were compensation for past services. They were not a gift. Opinion MURDOCK, Judge: There would be no reason to reverse the determination of the Commissioner if the minutes of the meetings of the board of *193 directors of Operating were the only evidence showing the nature of the payments in question. Neither the word "gift" nor any other word indicating a donative intent is mentioned anywhere in those minutes. They contain, on the contrary, a number of expressions tending to show that the board was not making the payments merely to satisfy its desire to become a benefactor, but added these amounts voluntarily to the compensation which it was required to pay the petitioner in recognition of his past services and in discharge of a strong moral obligation which it recognized as a result of the extended services and the summary dismissal of this efficient employee. The petitioner 1942 and there was no legal obligation on the part of Operating to pay him any additional amount. However, it is not determinative that the idea originated with Operating and the payments were voluntary. The following excerpt from the case of , in which a corporation had made a so-called wedding gift to its president, is apposite: "The money the petitioner accepted from the corporation which had benefited from his services may have been compensation for such *194 services, and not necessarily a gift, even though it was made voluntarily. ; cf. . If there was a consideration for it, there was no gift. ; . What are in fact bonus payments by way of additional compensation paid in recognition of some obligation not legally enforceable are taxable as income. . "In each instance where an employer adds something voluntarily to the compensation which is paid to an employee in full discharge of the employer's legal obligation as such the test as to the taxability of the additional amount received is whether under the particular circumstances what was added was by way of more compensation for a deserving employee or merely to satisfy the employer's desire to become a benefactor. ; ; see Magill, Taxable Income (Rev. ed. 1945) 393-405; Mertens, *195 Law of Federal Income Taxation (1942) §§ 6.07, 8.08." The petitioner argues that the accounting and tax treatment of the payments by Operating support his contention that the $8,000 was a gift. In the first place, the evidence on these points is not clear in all particulars. Furthermore, the November payment was charged to expense through the payroll account, the December payment was charged to profit and loss, and the 1943 payments were charged to expense as of April 30, 1943. That evidence is none too helpful to the petitioner's case. The petitioner attempts to minimize the importance of the requirement that the petitioner release all claims to pension and retirement benefits which might accrue after October 31, 1942 by arguing that there were no such claims since the payment was a gift. This argument begs the question. The strongest point in the petitioner's favor is the testimony of the president of Operating and two other men who were vestrymen of Trinity Church, one of whom was counsel for Operating and the other a member of the board of directors. All three of these men were present at the meetings of the board referred to in the findings of fact. These three men testified *196 that they understood that the proposed payment of $8,000 to the petitioner was intended as a gift rather than additional compensation and it was so discussed and considered at the board meetings leading up to the final resolution. They stated positively that they could remember that that distinction was made, although they admitted their inability to remember the full details of the discussions. The integrity of these witnesses is not questioned despite the fact that the president received payments similar to those received by the petitioner as a result of his resignation one month after the petitioner was dismissed. They were but three of eleven persons who participated in the discussion. Considerable time has passed since the events took place. The recollection of the witnesses may be somewhat at fault on their notion of a gift may not coincide with the law for present purposes. The minutes would seem to be the best evidence of just what the board, as a board, did and intended to do. The payments were made pursuant to the resolution. If a gift had been intended the able counsel present could have disclosed that fact in the resolution. Incidentally, some of the testimony of these *197 witnesses tends to support the Commissioner's determination. There was obviously strong feeling about this matter. The president indicated that the dismissal was none of his doing and that he was not too welcome in the group that made the decision. He pointed out that some of the directors did not even know the petitioner by sight, while others had a strong feeling of animosity towards him, and he thought the payment was due partly to a guilty conscience on the part of some. There is other evidence to indicate that the directors felt some moral obligation towards the petitioner in making the payment. Another of these witnesses, in describing how the $8,000 amount was arrived at, mentioned that it was roughly one month's salary for each year he had been on the job and was one-half his annual salary. This and other evidence shows the close tie between the payment and salary. It is one thing for directors to give away corporate funds and it is quite another for them to make a voluntary payment to a longtime faithful employee. The petitioner was no stranger to this corporation. He had given his best efforts to its affairs for a number of years and the directors recognized that his services *198 had been of great value. He was being summarily dismissed. The question of severance pay was discussed. The possibility of continuing his employment with full salary for six months was discussed, but was rejected because the board desired to terminate his authority immediately. The petitioner rejected a suggestion that he resign with the understanding that his salary would continue for six months. The president asked the board on October 30th whether the offer to pay salary for six months was contingent upon resignation, and, if so, what was to be done about payments in case of dismissal. The consensus of the opinion of the board at that time, as indicated by the minutes of the meeting of October 28th, was that an offer be made to pay his salary for six months beginning November 1st. That part of the minutes was later expunged, but it is nevertheless revealing as to the attitude of the board at the time. The discussions led finally to the resolution of October 30, 1942, which in its original form authorized the president to pay to the petitioner monthly, "an amount equal to his salary for a period of six months beginning November 1, 1942 in appreciation of his past services" upon condition *199 that he release the corporation from all rights and claims to pension and retirement benefits not already accrued. It is difficult to find a gift in that resolution. It was a payment in recognition of past services with a condition attached. The past services could provide consideration, the agreement to release could be some consideration, and the discharge of the moral obligation would also indicate that the board was not merely satisfying a desire to become a benefactor to a person towards whom a number of members of the board bore a "strong feeling of animosity" and whom others had never seen. The facts, as a whole, support the determination of the Commissioner and fail to show that he has improperly construed the law or has committed error in including the $8,000 in the petitioner's taxable income. Decision will be entered for the respondent.